IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN TOLER,<br>on behalf of Plaintiff and the class<br>members described herein,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>GREEN ARROW SOLUTIONS, d/b/a<br>GREEN ARROW LOANS;<br>INTEGRA FINANCIAL SERVICES,<br>LLC; NEVADA IMPACT<br>MANAGEMENT, LLC;<br>DAN SHAW; GREG JONES;<br>JOHN DOES 1-10,<br><br>　　　　Defendants. | Case No. 1:22-cv-1214<br><br><br>DEMAND FOR TRIAL BY JURY |

**COMPLAINT – CLASS ACTION**

1. Plaintiff, John Toler, brings this action against Defendants (a) Green Arrow Solutions, d/b/a Green Arrow Loans, (b) Integra Financial Services, LLC; (c) Nevada Impact Management, LLC; (d) Dan Shaw; (e) Greg Jones; and (f) John Does 1-20 to secure redress for usurious and illegal loans (such as Exhibit A) made to Indiana residents.

2. Plaintiff seeks damages under the Indiana Consumer Credit Code (Count I) and treble damages under RICO (Count II).

**JURISDICTION AND VENUE**

3. The Court has subject matter jurisdiction under 28 U.S.C. §1331, 18 U.S.C. §1964, 28 U.S.C. §1337, and 28 U.S.C. §1367. Jurisdiction may also exist under 28 U.S.C. §1332(d), in that the amount in controversy on a classwide basis exceeds $5 million, exclusive of interest and costs, and in that there are believed to be over 100 members of the class, all of whom are of diverse citizenship to Defendants.

4. This Court has personal jurisdiction over each Defendant because they knowingly participated in the making of unlawful loans to Indiana residents.

5.   Venue is proper because acts to collect the loans impacted Plaintiff in the Southern District of Indiana.

6.   As set forth below, Defendants operate interactive websites through which they sought to and did make loans to Indiana residents. The use of an interactive website which permits Indiana residents (but not residents of specified other states) to apply for loans, along with the making and collecting of loans within the state, establishes a purposeful availment of Indiana and is sufficient to establish personal jurisdiction over the defendants responsible for the site. *Toys "R" Us, Inc., v. Step Two*, 318 F.3d 446, 454 (3rd Cir. 2003).

## PARTIES

7.   Plaintiff John Toler is a natural person who at all times relevant has resided in Johnson County, Indiana.

8.   Defendant Green Arrow Solutions purports to be an entity created and owned by the Big Valley Band of Pomo Indians of the Big Valley Rancheria ("Tribe"). (Exhibit A) As set forth below, it is not owned by the Tribe.

9.   Green Arrow Solutions does business as Green Arrow Loans via the website, www.greenarrowloans.com.

10.  Defendant Integra Financial Services, LLC ("Integra") is a limited liability company organized under Nevada law. It uses the address 1759 N. 400 East, Suite 202, North Logan, Utah. Its registered agent and office is Registered Agent Inc., 401 Ryland St., Ste. 200-A, Reno, NV 89502. It has a single managing member, Nevada Impact Management, LLC.

11.  Defendant Nevada Impact Management, LLC ("Impact") is a limited liability company organized under Nevada law. Its registered agent and office is Registered Agent Inc., 401 Ryland St., Ste. 200-A, Reno, NV 89502.

12.  Impact has two managers, Dan K. Shaw ("Shaw") and Gregory Jones ("Jones"), both of 2520 St. Rose Pkwy., Suite 111, Henderson, NV 89074.

13.  Shaw and Jones are named as Defendants herein.

14. Both Integra and Impact are run by Defendants Dan Shaw and Greg Jones.

15. Impact also is manager of a company, Loan Trax LLC, also located at 1759 N. 400 E Suite 202, North Logan, UT 84341.

16. On information and belief, Shaw and Jones formed Integra in July 2011 for the purposes of acquiring substantially all of the assets of Impact Payment Systems, LLC, an Internet lender.

17. Impact Payment Systems, LLC had been sued by the SEC in March 2011. The SEC alleged that it was a Ponzi scheme which raised $47 million to lend.

18. On April 3, 2012, Integra moved to terminate the receivership of Impact, having acquired its assets and operations.

19. In about 2014, Shaw, Jones, Integra and Impact created Green Arrow Solutions and www.GreenArrowLoans.com to continue to conduct a high-interest Internet loan business.

20. Shaw and Jones are the true operators and beneficiaries of www.GreenArrowLoans.com.

21. Shaw and Jones are not members of the Tribe.

22. Green Arrow Solutions make loans to consumers at more than 700%. (Exhibit C)

23. Green Arrow Solutions states on its website that "We do not always lend in every state. Our states of operation change frequently; please check back periodically to see if we are doing business in your state. We do not currently offer loans to customers in Arkansas, Colorado, Connecticut, Georgia, Maryland, Minnesota, Montana, New Hampshire, New York, North Carolina, Pennsylvania, Puerto Rico, Virginia, Vermont, Washington, West Virginia."

24. On information and belief, the list of states in which Defendants do not make loans depends on the likelihood they will face public or private enforcement actions.

25. The business operations of Green Arrow Solutions, including incoming and outgoing phone calls and emails, review of loan applications, underwriting, payment processing, website maintenance, and marketing, are conducted outside of the Tribe's reservation. On

information and belief, they are conducted in North Logan, Utah, for the benefit of persons who are not members of the Tribe.

26. The "hours of operation" on www.greenarrowloans.com are listed as "Monday - Thursday: 7:00 AM to 7:00 PM MST. Friday: 7:00 AM to 5:00 PM MST." The Tribe is in the Pacific time zone. Utah is in the Mountain time zone.

27. Green Arrow Solution's website is hosted in Los Angeles. (Exhibit B)

28. A number of other internet lenders also claim to be owned or operated by the Tribe, including:

    a. Big Valley Financial (www.bigvalleyfinancial.com);

    b. Golden Gate Funding (www.goldengatefunding.com);

    c. Tremont Lending (www.tremontlendingloans.com);

    d. Little Lake Lending (www.littlelakelending.com);

    e. Condor Credit (www.condorcredit.com).

29. John Does 1-20 are other natural or artificial persons who participated in the Internet lending scheme complained of herein.

**FACTS RELATING TO INTERNET LENDING BUSINESS**

30. Shaw, Jones and others developed a plan to make illegal high-interest loans over the Internet, while evading liability for such loans by using the tribal immunity of the Tribe.

31. While Green Arrow Solutions purports to be a tribal entity, it is not.

32. The actual lending operations were carried out and continue to be carried out in locations other than tribal lands.

33. No member of the Tribe participates in significant lending operations.

34. The profits from the lending activities are received by non-members of the Tribe.

35. The funds lent are transferred by ACH credit to the borrowers' bank accounts throughout the United States.

36. Repayment of the loans is made by ACH debit from the borrowers' bank accounts

throughout the United States.

## SOVEREIGN IMMUNITY AS A DEFENSE TO STATE USURY LAWS

37. An entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

38. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

39. An entity that "actually operates to enrich primarily persons outside the tribe or only a handful of tribal leaders" shows that it is not entitled to immunity. *People ex rel. Owen v. Miami Nation Enterprises*, 2 Cal. 5th 222, 211 Cal. Rptr. 3d 837, 386 P.3d 357 (2016).

40. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

41. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

42. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe

scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

43. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

## DEFENDANTS' LOANS

44. Green Arrow Solutions uses its website, www.GreenArrowLoans.com, to make loans to consumers at interest rates in excess of 700% annually. (Exhibit A)

45. On or about February 16-17, 2022, Green Arrow Solutions made a loan to Plaintiff (Exhibit A) for $300. The loan would result in repayment of $785 if paid every two weeks for four months. The total interest charged would be $485.59, which according to Green Arrow Solutions equates to an annual percentage rate of 775.12%, a rate in excess of that permitted in Indiana.

46. The loan agreement (Exhibit A) is a standard form.

47. The loan was made for personal purposes and not for business purposes.

48. The principal amount was transferred to Plaintiff's bank account in Indiana via ACH.

49. The loan was made entirely via the Internet.

50. The loan was to be repaid via ACH.

51. Plaintiff made some of the payments, including interest. On information and belief the total payments were $354.72.

52. Defendants' lending does not actually occur on the Tribe's reservation.

53. A significant majority of the transaction occurs within the State of Indiana – applying for the loan and receiving and collecting the funds.

54. The place where a consumer is located when he or she submits an application via an online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.").

55. Plaintiff has never set foot on the Tribe's land.

56. Loans to Indiana residents made in the same manner as the loan to Plaintiff are governed by the laws of the State of Indiana.

## INDIANA REGULATION OF LENDING

57. The Indiana Uniform Consumer Credit Code, Ind. Code §24-4.5-3-201, establishes a maximum loan finance charge of 36% per annum for consumer loans other than supervised loans of the amount at issue here ($1500). It provides:

> (1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

58. With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code §24-4.5-3-508, provides:

> Loan finance charge for supervised loans.
>
> (1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.
>
> (2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:
>
>> (a) the total of:
>>
>>> (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;

    (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and

    (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or

  (b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

59. The amount of finance charge provided for in Exhibit A greatly exceeds that permitted in Indiana on any loans.

60. Ind. Code §24-4.5-1-201, "Territorial application," provides:

(1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .

  (c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.

  (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

  (e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.

  (f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

>(a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

>(b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

>(a) An agreement that the law of another state shall apply.

>(b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

>(c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

61.  Ind. Code §24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . . (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and **if the debtor has paid an excess charge the debtor has a right to a refund**. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

(4) **If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last

scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award ***reasonable attorney's fees*** incurred by the debtor. . . . (Emphasis added)

## COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE

62. Plaintiff incorporates paragraphs 1-61.

63. Because the loan made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff is entitled to ten (10) times the amount of the excess charge.

## CLASS ALLEGATIONS

64. Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

65. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of "Green Arrow Solutions" or "Green Arrow Loans" at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

66. Plaintiff may alter the class definition to conform to developments in the case and discovery.

67. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

68. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

69. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

70. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

71. Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

72. The class is entitled to a declaration that Defendants are not entitled to collect on the loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i. A declaration that the loans are void and need not be repaid;

    ii. Statutory damages;

    iii. Attorney's fees, expenses and costs; and

    iv. Such other or further relief as is appropriate.

## COUNT II – RICO

73. Plaintiff incorporates paragraphs 1-61.

74. This claim is against Shaw and Jones, who are the RICO "persons."

75. All loans made in the name of "Green Arrow Solutions" or "Green Arrow Loans" to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

76. The loans are therefore "unlawful debts" as defined in 18 U.S.C. §1961(6).

77. "Green Arrow Solutions" or "Green Arrow Loans" is an enterprise affecting interstate commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

78. Defendants Shaw and Jones are each associated with this enterprise.

79. Defendants Shaw and Jones each conducted or participated in the conduct of the affairs of "Green Arrow Solutions" or "Green Arrow Loans" through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

80. Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

81. Plaintiff brings this claim on behalf of a class.

82. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of "Green Arrow Solutions" or "Green Arrow Loans" at more than 36% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

83. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

84. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

    a. Whether the loans at issue are "unlawful debts" as defined in RICO.

    b. Whether "Green Arrow Solutions" or "Green Arrow Loans" is an "enterprise."

    c. Whether Defendants Shaw and Jones are each associated with "Green Arrow Solutions" or "Green Arrow Loans."

    d. Whether Defendants Shaw and Jones each conducted or participated in the affairs of "Green Arrow Solutions" or "Green Arrow Loans" through a pattern of making and collecting unlawful loans.

85. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

86. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

87. A class action is superior for the fair and efficient adjudication of this matter, in that:

   a. Individual actions are not economically feasible.

   b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

   i. Treble damages;

   ii. Attorney's fees, litigation expenses and costs of suit; and

   iii. Such other or further relief as the Court deems proper.

*/s/Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER**
   **& GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## **JURY DEMAND**

Plaintiff demands trial by jury.

/s/*Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER
 & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## NOTICE OF ASSIGNMENT

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

*/s/Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
**EDELMAN COMBS LATTURNER
    & GOODWIN, LLC**
20 S. Clark St., Suite 1500
Chicago, IL 60603
(312) 739-4200
(312) 739-0379 (FAX)

## **DOCUMENT PRESERVATION DEMAND**

      Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

                                                       */s/ Daniel A. Edelman*
                                                       Daniel A. Edelman